RUSSIAN ENTERTAINMENT WHOLESALE, INC. d/b/a St. Petersburg Publishing House, Plaintiffs,

v.

CLOSE–UP INTERNATIONAL, INC. and Natasha Ganem, Defendants,

Close–Up International, Inc., Counter–Claimant and Third–Party Plaintiff,

v.

Russian Entertainment Wholesale, Inc. d/b/a St. Petersburg Publishing House, Counter–Claim Defendant,

and

Natalia Orlova; Joseph Berov; Deandown Ltd.; DVD Expo, LLC; Widnes Enterprises, Ltd; Roman Dikhtyar; Image Entertainment, Inc.; and "John Does One Through One Hundred," Third–Party Defendants.

Civil Action No. CV–05–4073(BMC)(JMA).

United States District Court, E.D. New York.

March 3, 2011.

Julian H. Lowenfeld, for Third Party Plaintiff.

Joel K. Bohmart, Bohmart & Sacks, P.C., Alexander Berkovich, Esq., Michael Solton, Solton Rosen & Balakhovsky LLP, for Third Party Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COGAN, District Judge.

Third-party plaintiff Close–Up International ("Close–Up" or "plaintiff") brings suit against third-party defendants Deandown Ltd. ("Deandown"), DVD Expo LLC ("DVD Expo"), Widnes Enterprises, Ltd. ("Widnes") Roman Dikhtyar ("Dikhtyar") (collectively referred to as the "Ruscico defendants"[1]) and Joseph Berov ("Berov") for copyright infringement and willful copyright infringement of sixty-five Russian films, and against Image Entertainment, Inc. ("Image") for copyright infringement and willful copyright infringement of twenty-nine Russian films.[2]

The issue is simple to state but difficult to resolve. Close–Up has an exclusive license to distribute certain Russian films in their original Russian language. The Ruscico defendants, and through them, Image, have an exclusive license from the same licensor to distribute the same films—but with subtitles. The problem is that neither the licensor nor the two licensees, when they granted and obtained their respective rights, considered an obvious fact—a viewer can turn off the subtitles unless special protection is built into the films to prevent that. I hold that because Close–Up never obtained the right to enforce its license against a distributor of subtitled films without a "no shut off" switch, and because the Ruscico defendants are distributing exactly the films that their license permitted them to distribute, Close-up cannot prevail in this action.

## BACKGROUND

This case involves the rights to reproduce and sell DVD copies of sixty-five classic Russian films (the "Subject Works"). The Subject Works are part of what is sometimes referred to as the "Golden Collection," which, in total, consists of more than five hundred of the most critically acclaimed and popular Russian films made between the mid–1950s and the early–2000s. Each of the sixty-five Subject Works was produced by one of two Russian film studios, namely Federal State Unitary Enterprise Mosfilm ("Mosfilm") and Federal State Unitary Enterprise Filmofond Kionstudii Lenfilm ("Lenfilm").

Although the history of Mosfilm and Lenfilm is complicated, owing in part to the privatization of the studios that occurred after the dissolution of the Soviet Union, *see Films By Jove v. Berov,* 154 F.Supp.2d 432 (E.D.N.Y.2001), none of the parties dispute that the copyrights in the Subject Works are all held by Mosfilm and Lenfilm, with each studio owning the copyrights in the films it created. What is in

---

1. "Ruscico" is short for Russian Cinema Council.

2. For ease of reference, third-party plaintiff is referred to as "plaintiff" and all third-party defendants are referred to as "defendants."

dispute is the legal significance of various licensing agreements that the studios entered into. Throughout the late–1990s and 2000s, both Mosfilm and Lenfilm engaged in licensing programs whereby they licensed the rights to produce DVD versions of their films to multiple licensees, with each licensee obtaining different rights.

All of the parties to this litigation claim rights in some or all of the Subject Works, either through direct licenses with Mosfilm and Lenfilm, or through sublicenses that can be traced back to Mosfilm and Lenfilm. Close–Up is a New York corporation that restores and distributes Russian movies, and has a sublicense allowing it to reproduce and distribute all of the Subject Works. The Ruscico defendants consist of the following entities, which collectively refer to themselves as the Ruscico Group: Deandown, a U.K. business that is the direct licensee with Mosfilm; Widnes, a Cyprus business that licenses the Russian films internationally for Deandown; and DVD Expo, a Russian corporation that restores the films and manufactures the DVD disks that Deandown licenses for distribution, and is the direct licensee with Lenfilm. All three of these entities are controlled or otherwise related to the individual defendant Dikhtyar, a Russian citizen living in Moscow. Berov was formerly the owner of Russian Entertainment Wholesale, Inc., a DVD distributor that operated in the Brighton Beach area of Brooklyn, New York under the name St. Petersburg Publishing House ("SPPH").

### I. Plaintiff's Claims

Close–Up's complaint alleges the direct infringement of rights that it holds as the "exclusive" United States licensee of Russian-language-only DVD versions of the Subject Works.

Mosfilm produced sixty-one of the sixty-five films at issue in this litigation (the "Mosfilm Works"). With regard to the Mosfilm works, the parties dispute whether plaintiff's rights to reproduce and distribute Russian-language-only versions of the films in DVD format is infringed by defendants' reproduction and distribution of multilingual DVD versions of the films, which allow the user to turn off the subtitles. The parties also dispute whether defendants were required to include technology on their DVDs that would make it impossible to turn off foreign subtitles when the films are played with their original Russian soundtrack, and if they were, whether such a provision can be enforced by Close–Up in a copyright infringement action.

Lenfilm produced the remaining four films at issue (the "Lenfilm Works"). As with the Mosfilm Works, the parties dispute whether plaintiff's rights to reproduce and distribute Russian-language-only versions of the films in DVD format is infringed by defendants' reproduction and distribution of multilingual DVD versions of the films that can be watched in Russian without subtitles. However, unlike the Mosfilm works, there is no dispute regarding the scope of defendants' rights under the relevant licensing agreement with Lenfilm. Instead, the parties dispute whether defendants' licensing agreement remained in force after July 1, 2003.

### II. Procedural History

The procedural history of the copyright claims now before the Court is complicated by the fact that this case began as an anticipatory declaratory judgment action brought by SPPH, which is no longer involved in these proceedings. In its original action, SPPH sought a declaratory judgment to protect itself against copyright infringement assertions that Close–Up had made against it, but SPPH and Close–Up have since resolved those claims

through the entry of an Order on Consent in the related case of *Close–Up Int'l Inc. v. Berov*, 02–cv–2363.

The claims now before this Court arose from Close–Up's third-party complaint against the Ruscico defendants; their independent United States distributor, Image; and Berov, who, through SPPH, purchased DVDs from the Ruscico defendants and distributed them to the public. Berov defaulted by failing to enter an appearance in this litigation.

I held a bench trial to determine liability on plaintiff's claims against the Ruscico defendants and Image, and damages against all defendants, including Berov. All parties (with the exception of Berov) then submitted post-trial briefs regarding potentially dispositive legal issues, findings of fact and damages.

## FINDINGS OF FACT

The following facts were established at trial. For plaintiff's copyright infringement claims, plaintiff bore the burden of proving the elements of its claims by a preponderance of the evidence. Defendants bore the burden of proving by a preponderance of the evidence that their use of the material was authorized.

### I. *Mosfilm Films*

#### A. *Licensing Agreements with Plaintiff*

On April 30, 1998, Mosfilm entered into a licensing agreement with Krupny Plan granting Krupny Plan the exclusive right to reproduce hundreds of Mosfilm titles "only in the original version in the Russian language" through December 31, 2002. The agreement allowed Krupny Plan to reproduce the movies on any form of media then known or that would be known in the future.

On December 2, 2002, prior to the expiration of the April 30, 1998 agreement, Mosfilm entered into a subsequent licensing agreement with Krupny Plan that went through December 31, 2007. The 2002 agreement, unlike the 1998 agreement, was limited to DVD format. However, like the 1998 agreement, the 2002 agreement restricted Krupny Plan's rights to reproduce and distribute the subject works to "the original version in Russian language."[3] The 2002 agreement also contained a provision authorizing Krupny Plan to transfer the rights received under the agreement to third parties, and that such a transfer "shall be effected upon prior written agreement with the Licenser."

In contemplation of the need to obtain prior approval, on January 27, 2003, Krupny Plan sought authorization from Mosfilm to enter into a sublicense agreement with Close–Up. V.L. Rabinkov, the C.E.O. of Krupny Plan, sent a letter to Mosfilm regarding the prior authorization provisions of the December 2, 2002 agreement (as well as a separate agreement that is not at issue in this litigation).[4] The letter stated that, although Krupny Plan had not yet entered into any sublicensing agreements with regard to the above-referenced agreements, it was seeking approval to continue working with three companies with which it had previously contracted, and with which it would like to continue working in the future. One of the three companies listed was Close–Up. The letter stated that the "Distribution Territory and For-

---

**3.** The 2002 agreement also allowed Krupny Plan to reproduce and distribute the movies "with subtitles and voice-overs in languages of countries formed on the territory of the former Soviet Union." Those rights are not at issue in this litigation.

**4.** Because the second agreement was not offered as evidence at trial, it is unclear whether the agreement relates to DVD rights, VHS rights, or both.

mat" for Close–Up was "USA, Canada (VHS)." The two other companies referenced in the letter covered territory outside of the United States, but both were listed as distributing "VHS" format products. A.G. Litvinov, who is listed on the letter as the Senior Deputy Director of Mosfilm, signed the letter.

On March 25, 2003, Krupny Plan entered into an agreement with Close–Up that purported to give Close–Up the limited right to enforce Krupny Plan's legal rights against third parties distributing pirated DVD copies of over a thousand Mosfilm titles. The agreement did not provide Close–Up with the right to reproduce or distribute copies of the films.

On March 1, 2004, Krupny Plan entered into a separate licensing agreement with Close–Up, this time granting Close–Up the exclusive right to reproduce and distribute "the original versions in the Russian language on DVD video" of a list of titles that includes the Mosfilm Works. The agreement also stated that Close–Up "may not use the Films be it as a whole or in parts in ways not stipulated by the clause 1.1 of the present agreement."

On January 1, 2008, Mosfilm extended its sublicensing agreement with Krupny Plan through December 31, 2009. In addition to the Russian-only rights granted by the December 2, 2002 agreement, the January 1, 2008 renewal granted Krupny Plan the right to reproduce certain films in both Russian and with English-language subtitles and/or voice-overs.

On the same day, Krupny Plan executed a renewal of its sublicensing agreement with Close–Up. The renewal was effective through December 31, 2009, and involved the same rights Krupny Plan had just licensed from Mosfilm.

### B. *Licensing Agreements with Defendants*

Around the same time that Mosfilm was entering into and renewing licensing agreements with Krupny Plan regarding Russian-language-only versions of the subject works, Mosfilm was separately entering into licensing agreements with Deandown regarding multilingual versions of the same films. On October 7, 1999—about a year and a half after Mosfilm entered into the first licensing agreement with Krupny Plan and almost three years before Mosfilm entered into the licensing agreement with Krupny Plan regarding the rights that were later assigned to plaintiff—Mosfilm granted a separate license to Deandown to produce and distribute DVD copies of fifty Mosfilm movies.[5] The licensing agreement between Mosfilm and Deandown stated that Deandown has "the exclusive right to duplicate and reproduce the Films in multilingual versions on digital media of DVD format."

During the negotiations for the 1999 agreement, the parties never discussed whether Deandown would be required to include a technology on their DVDs that would have made it impossible for the viewer to turn off foreign subtitles while watching the movie in Russian. Dikhtyar testified that the parties discussed the rights-granting provision of the 1999 agreement and "determined that the only exclusion of our rights is the reproduction and production of disks solely in the Russian language." The parties agreed that

---

**5.** Although the 1999 agreement only listed fifty titles (forty-six of which are Subject Works), plaintiff conceded in its Pre–Trial Memorandum of Law and the parties' stipulated Pre–Trial Order that defendants obtained rights in all sixty-one Mosfilm Works.

To the extent that plaintiff now tries to argue that Deandown did not acquire any rights in twenty-five of the Mosfilm Works, that argument has no merit based on plaintiff's previous concession, and, regardless, has been waived.

Deandown would differentiate its DVDs from Krupny Plan's Russian-language-only DVDs by producing DVDs that contain dubbing and/or subtitles in foreign languages, thereby targeting the non-Russian-speaking market. Dikhtyar testified that Mosfilm's "main demand" was for Deandown to produce DVDs that contained "the maximum number of foreign languages."

On April 7, 2000, Deandown entered a sublicensing agreement with Widnes, assigning the "Exclusive Distribution Rights of Multilanguage DVD" copies of the Mosfilm Works that Deandown had licensed from Mosfilm.[6] And on September 27, 2000, Widnes entered into a sublicensing agreement with Image, which stated that it was an "exclusive output distribution agreement" for DVD copies of the Subject Works.[7]

Not until June 27, 2005, did Mosfilm and Deandown execute an addendum to the 1999 Agreement that dealt with the problem of shutting off subtitles. The addendum added the following requirement regarding the DVDs produced and distributed by Deandown and its sublicensees:

> Reproduction of motion pictures shall envisage compulsory encoded foreign language subtitle and/or foreign language sound tracking of the picture plus compulsory elimination of the DVD player and/or remote control subtitle turn-off function making it impossible to view motion pictures without foreign lan-

guage subtitles or foreign language dubs on home DVD players. Absence of the above-mentioned restrictions on glass masters, as well as on manufactured motion picture DVDs shall be deemed as infringement of the present Agreement.

The addendum went on to discuss the steps that Deandown was required to take to remove infringing DVDs from the market. It stated:

> The Distributor, within 30 (thirty) days from the moment the present agreement is signed, pledges to withdraw all DVDs of motion pictures that do not correspond to the relative provisions of Agreement No. 1/28 of October 7, 1999, that are currently being sold at stores and stored at wholesale warehouses on the distribution territory pursuant to paragraph 1 of the present Addendum.[8]

Although the 2005 agreement contained restrictions that were not contained in the 1999 agreement, Mosfilm never notified the Ruscico defendants that their DVDs did not comply with the terms of the 1999 agreement. To the contrary, Dikhtyar testified that, between October 1999 and June 2005, no one from Mosfilm ever complained about their DVDs or advised the Ruscico defendants that they were in violation of the 1999 agreement.

II. *Lenfilm Films*

A. *Licensing Agreements with Plaintiff*

On September 5, 2001, Lenfilm entered into a licensing agreement with Lenfilm–

---

6. Plaintiff argues in its Post–Trial Reply Memorandum of Law that Deandown's assignment of rights to Widnes and DVD Expo were invalid. However, plaintiff conceded in its Pre–Trial Memorandum of Law and the Pre–Trial Order that the assignments to Widnes and DVD Expo were valid. This argument has therefore been waived.

7. Although the version of the agreement admitted into evidence only appears to list one of the Subject Works—Vie or Spirit of Evil—

plaintiff does not contest that Image obtained a license to distribute all of the Subject Works. Plaintiff only contests the meaning and the validity of those licenses.

8. The Ruscico defendants dispute the translation of this provision. They argue that Addendum required defendants to withdraw all DVDs "that are now *on consignment*." It is unnecessary to decide which version is a more faithful translation of the provision.

Video, LLC ("Lenfilm–Video"), granting the exclusive rights to reproduce and distribute in the United States "videodisc" copies of numerous films, including the four Lenfilm Works,[9] in the original Russian language.[10] The agreement stated that, for the Lenfilm Works, the date of the commencement of the agreement was to be July 2, 2003. The agreement also contemplated the possibility of Lenfilm further licensing the rights to use subtitled and/or dubbed versions of the Films in other languages to Lenfilm–Video. However, it does not appear that Lenfilm ever granted such a license.

On July 5, 2002, Lenfilm–Video assigned its rights to reproduce and distribute the Lenfilm Works to Klassik Films, LLC ("Klassik Films"), including rights to reproduce and distribute subtitled and dubbed versions of the films "in other languages," and the exclusive right to distribute the films "on any territory without restriction."[11] Klassik Films then assigned the rights to reproduce and distribute videodisc copies of the Lenfilm works in the original Russian language to Krupny Plan on July 20, 2003.

On March 1, 2004, Krupny Plan entered into a licensing agreement with Close–Up that assigned the exclusive right to reproduce DVD copies of the original Russian versions of the Lenfilm Works, and the exclusive right to distribute such DVDs in the United States and Canada.

## B. Licensing Agreements with Defendants

On January 14, 2002—only four months after Lenfilm entered into a licensing agreement with Lenfilm–Video—Lenfilm entered into a separate licensing agreement with DVD Expo, granting DVD Expo the exclusive right to reproduce nine Lenfilm movies, including the Lenfilm Works,[12] "in any way possible" through July 1, 2003.

At trial, Dikhtyar testified that it was his "understanding" that Lenfilm's conduct under this license permitted him to continue to distribute DVDs of Lenfilm's titles after that expiration date, and that the parties discussed such an extension during negotiations that extended through 2006. However, other than Dikhtyar's testimony regarding his understanding of the continuing validity of the Lenfilm/DVD Expo licensing agreement, defendants did not present any evidence to show that the agreement stayed in force after July 1, 2003.

## CONCLUSIONS OF LAW

Plaintiff brings claims of copyright infringement and willful copyright infringement under 17 U.S.C. § 501 against the Ruscico defendants and Image. Plaintiff alleges that the Ruscico defendants infringed plaintiff's exclusive licenses to reproduce and distribute Russian-language

---

9. The four Lenfilm films at issue in this litigation are: Captivating Star of Happiness (Zvelda plentitel'nogo schastya), Hamlet (Gamlet), King Lear (Korol' Lir) and Lady With a Dog (Dama s sobanchkoi).

10. The agreement also gave Lenfilm–Video the right to reproduce and distribute the Lenfilm Works with subtitles in the languages of the former Soviet territories, however those rights are not at issue in this litigation.

11. Although the version of the agreement admitted into evidence does not appear to list

any of the Lenfilm Works, defendants do not contest plaintiff's chain of title in these films.

12. Plaintiff argues in its Post–Trial Memorandum of Law that the agreement did not assign rights to Captivating Star of Happiness. However, plaintiff conceded the validity of defendants' chain of title in its Pre–Trial Memorandum of Law, therefore waiving the argument that the 2002 agreement did not give defendants rights in that film.

versions of the sixty-one Mosfilm Works and the four Lenfilm Work, and that Image infringed plaintiff's exclusive licenses in twenty-seven of the Mosfilm Works and two of the Lenfilm Works.

■ In order to make out a claim for copyright infringement, a plaintiff must prove: (1) the existence and validity of its copyrights in the work, and (2) copying constituent elements of the work by defendants. *Feist Publ'ns Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). As discussed below, because plaintiff has failed to prove that defendants infringed plaintiff's limited rights in the Subject Works, defendants have failed to establish copyright infringement or willful copyright infringement against any of the defendants.

### I. *Existence of a Valid Licensing Agreement*

The first element a plaintiff must establish to make out a claim of copyright infringement is that the plaintiff possessed a valid copyright in the work. However, the actual copyright holder is not the only party entitled to sue for copyright infringement. "Pursuant to 17 U.S.C. § 501(b), the legal or beneficial owner of rights under a copyright may pursue an action for infringement of that copyright committed while he or she is the owner of it." *American Plastic Equip., Inc. v. Toytrackerz, LLC,* 07–cv–2253, 2009 WL 902422, at *5 (D.Kan. March 31, 2009). Defendants do not dispute that plaintiff had a valid exclusive license to produce Russian-language-only versions of the four Lenfilm works at issue in this litigation. Therefore, plaintiff has established the

first element of copyright infringement for those works.

However, defendants do dispute the validity of plaintiff's rights in the Mosfilm works. Defendants argue that plaintiff does not have a valid sublicense to reproduce or distribute the films because Krupny Plan never received written prior authorization from Mosfilm to assign its DVD rights to Close–Up. According to defendants, although Mosfilm authorized Krupny Plan to assign some of its rights to plaintiff when it signed the January 27, 2003 letter, those rights were expressly limited to the right to reproduce and distribute VHS copies of the Subject Works because the letter stated that Close–Up's format was VHS.

■ While I agree with defendants that the January 27, 2003 letter did not authorize Krupny Plan to transfer its rights in the Mosfilm Works to plaintiff, I hold that plaintiff has met its burden of proving that Mosfilm authorized Krupny Plan to transfer its rights to plaintiff prior to March 1, 2004.[13] On March 29, 2006, the CEO of Mosfilm signed a declaration, which stated that "Krupny Plan transferred its [DVD] rights to Close–Up International Inc. pursuant to Agreement Number 021 of March 1, 2004." Although this declaration is not particularly probative with regard to interpreting the written agreements between the parties, it is sufficient to prove, by a preponderance of the evidence, that Mosfilm authorized Krupny Plan to transfer its DVD rights to plaintiff prior to March 1, 2004.

The fact that the authorization does not appear to have been in writing—as was required by the 1999 agreement—does not

**13.** The March 25, 2003 license between Krupny Plan and Close–Up is not a valid licensing agreement because a party cannot assign exclusive rights solely for the purpose of having the licensee bring suit. *Silvers v. Sony Pictures Entm't, Inc.,* 402 F.3d 881, 890 (9th Cir.2005) ("The bare assignment of an accrued cause of action is impermissible under 17 U.S.C. § 501(b)."); *Nafal v. Carter,* 540 F.Supp.2d 1128 (C.D.Cal.2007).

render the assignment of rights from Krupny Plan to plaintiff void. Instead, the lack of a writing memorializing Mosfilm's approval makes the subsequent agreement between Krupny Plan and plaintiff voidable by Mosfilm. *Cf. Stiefvater Real Estate, Inc. v. Hinsdale*, 812 F.2d 805, 809 (2d Cir.1987) (regarding common law statute of frauds). Thus, defendants, who are not parties to the agreements, do not have standing to challenge the transfer based on the parties' failure to memorialize their agreement in writing.

"Courts have repeatedly held that where a transferor and transferee of a copyright agree that the transfer was valid, an alleged infringer may not use the writing requirement as a sword to avoid liability." *AMC Film Holdings LLC v. Rosenberg*, 03–cv–3835, 2005 WL 2105792 (E.D.N.Y. Aug. 31, 2005); *see also Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir.1982); *Arthur A. Kaplan Co. v. Panaria Int'l, Inc.*, 96–cv–7973, 1998 WL 603225, at *6 (S.D.N.Y. Sept. 11, 1998) (refusing to analyze the validity of assignment agreements at the behest of the defendant where the assignor and assignee were in agreement that an assignment had taken place), *aff'd*, 205 F.3d 1321 (2d Cir. 2000). Although the above cases all deal with New York's statute of frauds or the copyright statute of frauds contained in 17 U.S.C. § 204(a), there is no reason that a contractual provision requiring that an agreement be in writing would apply any differently. Both the contractual writing requirement at issue in this case and the statute of frauds contained in § 204(a) are meant to protect the licensor's rights, and therefore both are vindicated "by the copyright owner's later execution of a writing which confirms the agreement." *Eden Toys, Inc.*, 697 F.2d at 36.

Because plaintiff has proven that Mosfilm authorized Krupny Plan to assign its DVD rights to Close–Up, plaintiff has proven the existence of a valid copyright in both the Mosfilm and Lenfilm Works.

## II. *Copying of Constituent Elements of the Rights in the Work Owned By Plaintiff*

Even if plaintiff obtained rights from Krupny Plan in all of the Subject Works, it may only sue for infringement of the limited rights for which it was granted exclusivity, namely, the rights to reproduce and distribute Russian-language-only versions of the films. Because the DVDs reproduced and distributed by defendants were all multilingual versions of the films, *not* Russian-language-only versions, plaintiff may not sue for infringement of its limited exclusive rights.

■ The Copyright Act establishes that the "legal or beneficial owner of an exclusive right under a copyright" may bring suit for infringement under the Act. *See* 17 U.S.C. § 501(b). However, when this provision is invoked by an exclusive licensee, the licensee may seek relief from infringement only for the rights that the licensee has been exclusively licensed by the copyright holder. *Eden Toys, Inc.*, 697 F.2d at 36 ("An exclusive licensee of a right under a copyright is entitled to bring suit for infringement of that particular right.") (citations and internal quotation marks omitted); *see also* 3 M. Nimmer, et al., *Nimmer on Copyright*, § 12.02[B], at 12–57 (2009 rev. ed.) ("Of course, an exclusive licensee may not sue for infringement of rights as to which he is not licensed, even if the subject matter of the infringement is the work as to which he is a licensee.").

Plaintiff has shown that, as of March 1, 2004, it was the legal and beneficial licensee of the narrow right to reproduce and distribute *Russian-language-only* versions of the subject works. Therefore, even if plaintiff had a valid sublicense, plaintiff

would still only have standing to sue for infringement of the narrow right to reproduce and distribute Russian-language-only DVDs of the Mosfilm works that has occurred since March 1, 2004.

Plaintiff argues that defendants' DVDs infringe plaintiff's rights to reproduce and distribute Russian-language-only DVDs because multilingual DVDs may compete with some portion of the target market for plaintiff's DVDs. However, the mere fact that defendants' DVDs might compete with plaintiff's DVDs for some portion of the market does not necessarily mean that defendants' DVDs infringe plaintiff's rights. *See Random House, Inc. v. Rosetta Books LLC,* 150 F.Supp.2d 613 (S.D.N.Y.2001) (holding that eBooks do not infringe license to produce works "in book form," despite possible competition between the two products) *aff'd,* 283 F.3d 490 (2d Cir.2002). The original rights holders, Mosfilm and Lenfilm, were free to divide their rights under the Copyright Act and then license them in any manner of their choosing. *See Morris v. Bus. Concepts, Inc.,* 283 F.3d 502, 504 nn. 1 & 2 (2d Cir.2002).

The evidence presented at trial proves that Mosfilm and Lenfilm elected to grant a "Russian language only" right to one licensee, and a separate "multilingual" right to another. The rights-holders did not consider sales of the multilingual DVDs manufactured by the Ruscico defendants to violate the "Russian language only" license separately given to Krupny Plan. Instead, they considered the multilingual DVDs to be a distinct line of products, geared towards the separate non-Russian-speaking market. Whereas Russian speakers would be willing to purchase Russian-only DVD copies of the films, non-Russian speakers would pay a premium to purchase DVD copies that contain foreign language subtitles and/or dubbing. In this way, the non-Russian-speaking market would subsidize the Ruscico defendants for the expense of having to added foreign-language subtitles and dubbing to the films.

■ Because Mosfilm and Lenfilm chose to split up Russian-language-only DVD rights and multilingual DVD rights between two different licensees, plaintiff's rights are limited to the Russian-language-only rights that it acquired from Krupny Plan. And because plaintiff may only sue for infringement of the limited rights that it possesses, plaintiff is unable to satisfy the second element of a copyright infringement claim, namely, that the defendant copied the constituent elements of the protected work. Plaintiff has failed to put forth any evidence that defendants ever produced or distributed works that infringed plaintiff's limited rights in Russian-language-only DVDs of the Subject Works. Instead, the evidence shows that all of the DVDs produced and distributed by defendants were multilingual DVDs, which Mosfilm and Lenfilm viewed as being distinct from the Russian-language-only DVDs that they had authorized Krupny Plan to reproduce and distribute. Plaintiff thus has failed to make out a claim for copyright infringement against any of the defendants.

In so holding, I recognize that the case presents a "chicken and egg" problem. That is, from Close–Up's perspective, defendants were indeed distributing Russian-language-only DVDs because if a viewer turned off the subtitles, the product would be the functional equivalent of a Russian-language-only DVD. But to determine the proper perspective—whether the chicken or the egg came first—the proper framework is to analyze the parties' licensing agreements and determine if they thought, as Close–Up asserts now, that the products were the same. As shown below, they

did not, and the contractual language defines the proper scope of the licenses.

### III. Defendants Were Authorized to Reproduce and Distribute the Mosfilm Works

Plaintiff's copyright infringement claim fails with regard to the Mosfilm Works because the plain language of the licensing agreements between Mosfilm and Deandown clearly authorized defendants to reproduce and distribute multilingual DVD copies of the Subject Works, and any violations by ·defendants of covenants to those licensing agreements are not enforceable by plaintiff.[14] With regard to the period of time governed by the October 7, 1999 agreement, defendants were both authorized to reproduce and distribute the Mosfilm Works, and were fully in compliance with the terms of the agreement. With regard to the period of time governed by the July 27, 2005 agreement, defendants were still authorized to produce multilingual versions of the Mosfilm Works. However, the facts established at trial suggest that they may not have complied with some of the terms of the revised agreement. Nonetheless, because the terms of the agreement were covenants, not conditions precedent, Close–Up, as a licensor, may not sue to enforce those provisions.

### A. October 7, 1999 Agreement Between Mosfilm and Deandown

 Whether plaintiff was authorized to reproduce and distribute multilingual copies of the Mosfilm Works under the October 7, 1999 agreement hinges entirely on the meaning of the 1999 agreement. Under New York law,[15] the initial question for the court to consider when interpreting a contract is "whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir.2010). A contract term is deemed to be ambiguous when the term is "susceptible to at least two reasonable meanings." *Kemelhor v. Penthouse Int'l, Ltd.*, 689 F.Supp. 205, 212 (S.D.N.Y.1988). In determining whether a term is ambiguous, the words of the contract are to be given their ordinary and reasonable meaning. *Keene Corp. v. Bogan*, 88–cv–217, 1990 WL 1864, at *6 (S.D.N.Y. Jan. 11, 1990) (citing *Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982)). "[A] party cannot create an ambiguity in an otherwise plain agreement merely by 'urging different interpretations in the litigation.'" *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir.1999) (quoting *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990)).

 Whether a contract is ambiguous is a purely legal question. Likewise, the meaning of an unambiguous contract is a matter of law. *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir.2000).

---

**14.** In Plaintiff's Post–Trial Memorandum of Law, it argues that, even if Mosfilm assigned rights to the subject works that could be watched in Russian, such an assignment would be invalid because Mosfilm had already assigned such rights to plaintiff. However, this argument is a complete 180–degree reversal from plaintiff's Pre–Trial Memorandum of Law, in which it argued that the scope of defendants' rights could be determined entirely by interpreting the 1999 and 2005 agreements. Therefore, plaintiff's argument that Mosfilm did not have any power to enter into the 1999 and 2005 agreements has been waived.

**15.** Defendants waived the right to invoke Russian law by failing to notify plaintiff of their intention to do so, as required by Federal Rule of Civil Procedure 44.1. Therefore, the court may apply forum law. *MSF Holding Ltd. v. Fiduciary Trust Co.*, 435 F.Supp.2d 285, 301 (S.D.N.Y.2006).

Only if the contract is found to be ambiguous may the factfinder consider evidence extrinsic to the contract, including testimony offered by the parties. *Diesel Props S.r.l. v. Greystone Business Credit II LLC,* 631 F.3d 42 (2d Cir.2011); *Amusement Bus. Underwriters v. Am. Int'l Group, Inc.,* 66 N.Y.2d 878, 880–81, 498 N.Y.S.2d 760, 763, 489 N.E.2d 729 (1985).

In this case, none of the terms of the October 1999 agreement are fairly susceptible to two different interpretations. The contractual language unambiguously limits Deandown's rights to reproduce and distribute DVD copies of the Mosfilm Works to DVDs containing subtitles and/or dubbing in foreign languages, and unambiguously does not require Deandown to include a feature on its DVDs that makes it impossible to turn off foreign subtitles when watching the DVDs in Russian.[16]

The Deandown licensing agreement contains the following provisions relevant to this litigation:

1.1 The Rights' Owner provides to the Distributor, indicated in the present Agreement, as well as and in accordance with and on the terms of the present Agreement, exclusive rights of use of the feature films (hereinafter, the Films), listed in Appendix 1, being an essential part of the present Agreement, solely by means of reproduction, replication and dissemination of copies of the Films in digital media of DVD format, only dubbed and/or subtitled in foreign languages.

1.2.1 Exclusive rights of reproduction and replication of the Films in multilingual versions in digital media "DVD" format. Reproduction of the Films in the original language without the accompaniment of the picture by sound and/or subtitles in a foreign language is a violation of the present Agreement. . . .

1.2.2 The exclusive right of dissemination by means of sales and rentals of copies of DVD-format digital media of the Films in the Multilanguage version, in the territory, indicated in paragraph 1.3 of the Agreement. Dissemination of copies of DVD-format digital media with records of the Films in the Multilanguage version outside the territory referred to hereinabove is a violation of the present agreement.

1.3.1 The present agreement does not provide to the Distributor the rights to reproduction of the Films in DVD digital format solely in the original language, without subtitles or dubbing in other languages, nor their dissemination by any means in the Territory. The Rights' Owner has the right to fully or partially transfer the rights identified in this clause to any third party.

Defendants' DVDs—all of which contain foreign-language subtitles, as required by the 1999 agreement—were produced in accordance with the provisions of the agreement.

Plaintiff does not dispute that the versions of the Mosfilm Works produced and distributed by defendants contained subtitles in foreign languages, as required by the licensing agreement. Instead, plaintiff argues that the 1999 agreement implicitly required defendants to include an additional feature on their DVDs that would make it impossible for the user to turn off the foreign-language subtitles when watching the movie in Russian. In support of this argument, plaintiff points to three separate provisions of the 1999 agreement, all of which, plaintiff argues, required defendants to include a disabling feature on the

---

**16.** Although defendants argue that the contract is ambiguous, they do not point to a single term or provision in the agreement that is fairly susceptible to two different meanings.

DVDs they produced between 1999 and 2005.

Plaintiff first argues that the language of paragraph 1.1—the rights-granting provision of the agreement—granted defendants the right to reproduce and distribute DVDs only if those DVDs included a disabling feature. Plaintiff argues that "[t]he word 'only' in Art. 1.1 admits no ambiguity," and that it unambiguously means "merely, solely, alone, just." While plaintiff is correct with regard to the restrictive meaning of "only," plaintiff ignores what it was that Deandown was "only" allowed to do under the agreement, namely, reproduce and distribute "copies of the Films in digital media of DVD format, only dubbed and/or subtitled in foreign languages." Because there is no evidence that defendants reproduced or distributed DVD copies of the Mosfilm Works that did not contain subtitles or dubbing in foreign languages, defendants' conduct was entirely within the scope of their rights under the 1999 agreement.

Plaintiff next argues that paragraph 1.2.1, which states that "[r]eproduction of the Films in the original language without the accompaniment of the picture by sound and/or subtitles in a foreign language is a violation of the present Agreement," should be interpreted to mean that production of DVDs that *could be watched* in Russian without subtitles or dubbing was a violation of the agreement. However, plaintiff reads too much into this provision, which explicitly states that its purpose was to ensure that the DVDs produced by Deandown would be "multilingual versions." In this context, it is clear that paragraph 1.2.1 simply forbade Deandown from producing DVD copies of the Mosfilm Works that did not include foreign subtitles or dubbing accompanying the films. Because all of the DVDs produced by defendants were multilingual versions that included subtitles in numerous foreign languages, defendants did not violate this provision of the agreement by producing DVDs that did not contain a disabling feature.

Finally, plaintiff argues that paragraph 1.3.1, which states that "[t]he present agreement does not provide to the Distributor the rights to reproduction of the Films in DVD digital format solely in the original language, without subtitles or dubbing in other languages, nor their dissemination by any means in the Territory," prohibited the distribution of DVDs that could be watched in Russian without subtitles. In support of this argument, plaintiff states that the phrase "by any means" is "broad and sweeping." However, just as with plaintiff's argument regarding the meaning of "only" in paragraph 1.1, plaintiff fails to recognize what it is that Deandown was forbidden from doing "by any means." The phrase "by any means" in paragraph 1.3.1 refers to Deandown's right to "disseminate" infringing DVDs in the territory. This provision is simply not applicable to defendants' DVDs, which were not made "in DVD digital format *solely in the original language.*" Instead, defendants' DVDs included "subtitles or dubbing in other languages" as required by paragraph 1.3.1 of the agreement. Thus, distribution of defendants' DVDs was in no way limited by the terms of paragraph 1.3.1.

Plaintiff, apparently recognizing that the DVDs produced and distributed by defendants are in compliance with the explicit terms of the three provisions discussed above, next argues that the disabling feature was necessary to effectuate the purpose of a separate licensing agreement between Mosfilm and Krupny Plan, which allowed Krupny Plan to produce and distribute Russian-language DVDs of several of the same films licensed to Deandown.

However, this argument also fails because, regardless of whether reading such a restriction into the 1999 agreement would aid in harmonizing it with the Krupny Plan agreement, this Court is not authorized to read a restriction into an integrated, unambiguous contact that is not evident from the four corners of the document. To do so would be to rewrite the contract rather than interpret it. *See Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613 (1st Dep't 1990) ("Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement."). It is not this Court's role to rewrite the contract, even if doing so would improve upon the agreement or the way that the agreement interacts with other agreements that Mosfilm had entered into with various third parties. *See Wastemasters, Inc. v. Diversified Investors Servs. of N. Am., Inc.*, 159 F.3d 76, 79 (2d Cir.1998) ("[C]ourts should not rewrite the contracts before them to conform to their own conception of business equity."); *St. Mary Home, Inc. v. Serv. Emps. Int'l Union, Dist.*, 116 F.3d 41, 45 (2d Cir.1997) ("It is not for us to second-guess that choice or to judicially write the agreement because of party now wishes it were different."). This is especially true when, as here, doing so would require the Court to hold defendants accountable for failing to take affirmative steps that are simply not required by the language of the 1999 agreement.

Similarly, to the extent that plaintiff brings suit to vindicate the contractual rights of Mosfilm, Mosfilm could have negotiated the agreement so as to require Deandown to include the necessary technology so that the foreign-language subtitles could not be turned off. *KB Dissolution Corp. v. Great Am. Opportunities, Inc.*, 705 F.Supp.2d 326, 329 (S.D.N.Y. 2010). The parties clearly could have included such language in the October 7, 1999 agreement, as they did when they executed an addendum to the agreement on June 27, 2005. And, if they had done so, they presumably would have negotiated a requisite trade-off for including the additional restriction in the agreement. Reading such a restriction into the agreement now would provide a windfall to plaintiff and would violate defendants' reasonable expectations as expressed in the agreement. *BP Air Conditioning Corp. v. One Beacon Ins. Group.*, 8 N.Y.3d 708, 840 N.Y.S.2d 302, 871 N.E.2d 1128 (2007).

In this connection, plaintiff suggests that the amended agreement of June 27, 2005, which required the addition of a "no turn off" switch for the subtitles, illustrates the original intent of the parties. I can draw no such inference in light of the absence of any evidence that the parties considered the issue in 1999. In fact, the newly perceived need for the 2005 amendment is further evidence that there was no such requirement placed upon Deandown in the 1999 agreement.

Finally, although it is not necessary to consider parol evidence when interpreting an agreement that is unambiguous on its face, it is worth noting that the parol evidence adduced at trial supports this interpretation of the agreement. It does not appear that the parties ever contemplated requiring the Ruscico defendants to include technology on their DVDs that would make it impossible to turn off foreign subtitles when watching the films in Russian. To the contrary, the only limitation on the Ruscico defendants' rights that appears to have been discussed during the negotiations of the 1999 agreement was that they were not allowed to produce DVDs that could only be watched in Russian. The evidence regarding the parties' course of conduct after they entered into the 1999 agreement also supports this interpretation of the agreement. Between October

1999 and June 2005, no one from Mosfilm ever advised the Ruscico defendants that their DVDs were not in compliance with the 1999 agreement.

Based on both the unambiguous text of the 1999 agreement, and the parol evidence concerning the parties' negotiations and course of conduct with regard to that agreement, defendants were authorized to produce multilingual versions of the Mosfilm Works that could be watched in Russian without subtitles between October 7, 1999 and July 27, 2005.

### B. *July 27, 2005 Amended Agreement Between Mosfilm and Deandown*

Plaintiff next argues that, even if defendants did not violate the 1999 agreement, they nonetheless violated the July 27, 2005 agreement, which explicitly required Deandown to program all of the DVDs produced by defendants after the agreement went into effect in a way that would exclude the possibility of turning off subtitles, and to remove all existing DVDs "that are on consignment in the stores and wholesale warehouses" within thirty days.

In support this argument, plaintiff points to evidence that Yelena Yavorskaya ("Yavorskaya") purchased $839 worth of DVDs from the Ruscico defendants in March of 2009 that could be watched in Russian without foreign subtitles. These DVDs were all purchased from rusci-co.com, which appears to be a web site that allows customers to order DVDs directly from the Ruscico defendants.

Based on the evidence admitted at trial, it appears that the Ruscico defendants continued to sell DVDs that did not con-tain the technological features required by the July 27, 2005 agreement. The DVDs purchased by Yavorskaya could be watched in Russian without foreign subtitles. And because they were ordered directly from the Ruscico website, defendants cannot argue that they were sold by the Ruscico defendants prior to the 2005 agreement going into effect.[17]

 However, even if defendants violated the terms of the July 27, 2005 addendum, such a breach may not be enforced by Close–Up, which was not a party to the 2005 agreement. A licensee's breach of a covenant in a copyright license does not rescind the authorization to use the copyright work, but rather provides the *licensor* with a cause of action for a breach of contract. *Graham v. James,* 144 F.3d 229, 236–37 (2d Cir.1998); *Atlantis Info. Tech. v. CA, Inc.,* 485 F.Supp.2d 224, 233–34 (E.D.N.Y.2007); *see also Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 753–54 (11th Cir.1997) (breach of a covenant in a copyright license does no more than provide licensor an opportunity to seek rescission of the license, but does not constitute an *ab initio* rescission of the licensee's permission to use a copyrighted work); *Edgenet, Inc. v. Home Depot U.S.A., Inc.,* No. 09–CV–747, 2010 WL 148389, at *6 (E.D.Wis. Jan. 12, 2010) (quoting and relying on *Graham* ); *RT Computer Graphics, Inc. v. United States,* 44 Fed.Cl. 747, 756–57 (Fed.Cl.1999) (same).

 Generally, provisions in a contract are presumed to be covenants rather than conditions precedent because the al-

---

**17.** With regard to Image, plaintiff has failed to prove that any DVDs sold by Image after July 27, 2005 were received by Image from Widnes after the new Mosfilm–Deandown license revision went into effect. Sheydin testified that he could not tell from looking at DVDs sold by Image when the disk had been received by Image's customer, when the disk had be shipped to that customer by Image, when the disk had been received by Image from Widnes' manufacturer, or when the disk had been manufactured for the Ruscico group.

ternative often results in a forfeiture against one party or another. *See, e.g., Graham,* 144 F.3d at 237 (construing New York law); *Edgenet,* 2010 WL 148389, at *7 (construing Delaware law). In this case, the language of the July 27, 2005 agreement makes it clear that the new terms are covenants, not conditions precedent. The agreement explicitly stated that reproduction of non-complying disks is a "violation" of the agreement, rather than the failure to fulfill a condition precedent. Therefore, the appropriate remedy for a breach of the covenants is a breach of contract action brought by Mosfilm, not a copyright infringement action.

The Second Circuit held in *Graham v. James* that, if a defendant's conduct " 'constitutes a breach of a covenant undertaken [by the defendant] and if such covenant constitutes an enforceable contractual obligation' " in the defendant's license agreement with the copyright holder, then the copyright holder will have " 'a cause of action for breach of contract,' not copyright infringement." 144 F.3d at 236 (quoting *Nimmer* § 10.15[A], at 10–120); *see also Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.,* 387 F.Supp.2d 521, 534 (M.D.N.C.2005) (holding that a licensee's use of a copyright work in excess of that which was authorized under the license was a breach of a covenant under the terms of the license agreement between the parties, and therefore the copyright holder was only entitled to breach of contract damages, and not copyright remedies). Because the correct cause of action for violation of the covenants of the July 27, 2005 agreement is a breach of contract action, not a copyright infringement action, plaintiff may not base its claim for copyright infringement on any breach of those covenants.

### IV. *Claims Dismissed Against Berov*

Because I find that plaintiff has failed to prove copyright infringement by the Ruscico defendants and Image, plaintiff is not entitled to recover damages against co-defendant Berov, who defaulted in this action by failing to enter an appearance. Where liability against the defendants "would have been joint had any been found, the dismissal of the complaint for lack of proof dispose[s] of the case against all defendants, including the defaulting defendant." *Davis v. Nat'l Mortgagee Corp.,* 349 F.2d 175, 178 (2d Cir.1965). In this case, liability would have been joint and several regardless of whether plaintiff had elected to recover statutory or actual damages. *Fitzgerald Publishing Co. v. Baylor Publishing Co.,* 807 F.2d 1110, 1116 (2d Cir.1986) (statutory damages); *Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 472 (2d Cir.1985) (actual damages). Therefore, the dismissal of plaintiff's claims against those defendants requires the dismissal of the claims against Berov as well.

### CONCLUSION

For the foregoing reasons, I find that plaintiff has failed to prove copyright infringement or willful copyright infringement against all defendants. The Clerk of the Court is directed to enter judgment in favor of defendants.